BIEBELBERG & MARTIN
Schoolhouse Plaza
374 Millburn Avenue
Millburn, New Jersey 07041
(973) 912-9888
(KB-5472)
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| BORIS KHAZIN, | : |
| | : Civil Action No.: 2:13-cv-04149 |
| | : SDW-MCA |
| Plaintiff, | : |
| v. | : |
| | : **AMENDED COMPLAINT AND** |
| T.D. AMERITRADE HOLDING CORPORATION | **JURY DEMAND** |
| T.D. AMERITRADE, INC., AMERIVEST | : |
| INVESTMENT MANAGEMENT COMPANY, | : |
| and LULE DEMMISSIE, individually, | : |
| | : |
| Defendants. | : |
| | : |
| | : |

        Plaintiff, Boris Khazin, with an address of 7907 Tamarron Drive, Township of

Plainsboro, State of New Jersey, by way of Amended Complaint against defendants,

T.D. Ameritrade Holding Corporation, T.D. Ameritrade, Inc., Amerivest Investment

Management Company, and Lule Demmissie, individually, states:

1

**THE PARTIES**

1.      The plaintiff, Boris Khazin, is an experienced professional in the financial services industry, with nearly 15 years of employment in the field.  He has worked for industry leaders such as Bloomberg, Standard & Poors, Paine Webber/UBS, and Citigroup; and for the defendant corporations herein.  He worked for the wholly-owned subsidiaries of the defendant holding company, specifically defendant T.D. Ameritrade, Inc. and defendant Amerivest Investment Management Company from 2006 until his termination on August 14, 2012.

2.      Upon information and belief, the three corporate defendants named herein, specifically, T.D. Ameritrade Holding Corporation; T.D. Ameritrade, Inc., and Amerivest Investment Management Company are Delaware corporations, with corporate headquarters in Omaha, Nebraska.  Defendants T.D. Ameritrade, Inc. (hereinafter "T.D. Ameritrade") and Amerivest Investment Management Company (hereinafter "AmeriVest") are wholly-owned subsidiaries of defendant T.D. Ameritrade Holding Corporation.  The corporate defendants are leading public companies in the financial services industry and have  corporate offices in Jersey City, New Jersey, where the plaintiff formerly worked.

3.      Individual defendant, Lule Demmissie, is a managing director of defendant T.D. Ameritrade who is also responsible for several divisions with the corporate structure of the defendants, including defendant AmeriVest, the Retirement

2

Division of defendant T.D. Ameritrade, and the Mutual Funds/ETF Division.

## JURISDICTION

4.    This Court has jurisdiction pursuant to 28 *U.S.C.* §1331 (federal question

jurisdiction).

5.    Venue is proper in the District of New Jersey pursuant to 28 U.S.C. §1391 in that

a substantial part of the events or omissions giving rise to the claim occurred in

this District and/or a substantial part of property that is the subject of the action is

situated in this district.  Moreover, the corporate defendants are subject to

personal jurisdiction in this district.

## PROCEDURAL HISTORY

6.    As will be explained in detail *infra*., plaintiff's claim in the within litigation charges

the defendants with a violation of the Dodd-Frank Act, a federal question claim.

7.    On or about January 18, 2013, plaintiff filed a Second Amended Complaint and

Jury Demand in the Superior Court of New Jersey, Law Division: Hudson County,

Docket Number L-4734-12.

8.    Plaintiff's Second Amended Complaint in the Superior Court contained seven

counts.  Count Two alleged a violation of the Dodd Frank Act.  The balance of

plaintiff's claims were for violations of state law and the common law.  All counts

pertained to wrongful termination as retaliation for "whistle-blowing".

9.    In response thereto, defendants filed a motion a seeking to dismiss plaintiff's

3

Dodd Frank claim for lack of jurisdiction and to compel arbitration on the balance of the claims.

10.   On July 1, 2013, the Honorable Mary K. Costello, J.S.C.issued an Order dismissing without prejudice Count Two of Plaintiff's claim (for violation of the Dodd Frank Act) for lack of subject matter jurisdiction, as Her Honor found that the federal court has exclusive jurisdiction over the Dodd-Frank claim, and compelling arbitration on the state law and common law claims.

11.   On July 8, 2013, plaintiff filed a Complaint and Jury Demand in the United States District Court for the District of New Jersey.

12.   On September 13, 2013, defendants filed a Motion to Dismiss or, to Dismiss the Action and Compel Arbitration.

13.   On September 25, 2013, plaintiff filed this Amended Complaint and Jury Demand in the United States District Court for the District of New Jersey.  As defendants' Motion to Dismiss is not considered  a responsive pleading, the plaintiff may amend his pleadings as a matter of right, pursuant to Federal Rules of Civil Procedure 15(a).

## FACTUAL BACKGROUND

14.   Plaintiff repeats the allegations set forth above, as if fully set forth herein at length.

15.   During his six-year tenure of employment, plaintiff Khazin was employed in several capacities by T.D. Ameritrade and AmeriVest.   At all times, Mr. Khazin's

4

performance met and exceeded expectations.  He was promoted on various occasions, each time assuming new and more demanding responsibilities.

16.     By way of example, several years after he began working for defendant T.D. Ameritrade, plaintiff was promoted to a position where he was tasked with responsibilities that involved risk analysis and due diligence of financial products. He worked at this position until 2011, at which time he was promoted to a position as an Investment Oversight Officer at AmeriVest.  At this position, as in his previous positions with the defendants, part of his responsibilities was to determine whether new AmeriVest products were appropriate for asset allocation and client risk tolerance.

17.     Throughout his tenure of employment with defendants T.D. Ameritrade and AmeriVest, the plaintiff was a conscientious and valued employee, a fact that was recognized repeatedly by defendants' upper management.  He performed every task that he was given by the company with professionalism and dedication.  He assumed more comprehensive responsibilities.  Indeed, he consistently received performance reviews of "exceeds expectations" throughout virtually the entire tenure of his employment.  His supervisors were pleased with his work and gave him high performance reviews.

18.     These superior reviews continued unabated until his final quarter of employment with AmeriVest, when he became the victim of retaliatory actions taken by his

supervisor, defendant Lule Demmissie, after the plaintiff urged more than once

that the defendant corporations meet certain ethical and legal standards that they

were required to uphold, but were not meeting.

**Plaintiff's Relationship with Managing Director Demmissie and MorningStar**

19.     During the latter part of plaintiff's employment with the defendants, a new group of

senior level managers came to his department.  Mr. Khazin's immediate

supervisor, Ivo Ivanov, left T.D. Ameritrade for other employment.  Among the

new managers was defendant Demisse, who became the Managing Director of

plaintiff's department, and his superior.[1]  Plaintiff reported to her.  This new

management team, led by  Demmissie, made a strategic decision to out-source to

other financial service companies certain financial services that had been

previously performed in-house by T.D. Ameritrade.  Ms. Demisse  actively

promoted MorningStar to perform certain specified outsourced work.

20.     At  Demmissie's direction, an agreement was reached with MorningStar, whereby

that company was to provide allocation and fund selection services for T.D.

Ameritrade's retail clients.  As has been noted, until this time, these services had

---

[1] In addition to being a Managing Director of T.D. Ameritrade, Ms. Demmissie held
several other positions within the defendant's corporate structure.  She was responsible
for three divisions, including AmeriVest, the Retirement Division of T.D. Ameritrade,
and the Mutual Funds/ETF Division.

been performed in-house by defendant T.D. Ameritrade.

21.     The selection of MorningStar as a third-party service provider caused a change in plaintiff's employment position with defendant T.D. Ameritrade.  Plaintiff was promoted to a new position in which he had responsibilities for risk analysis, due diligence and evaluation of MorningStar's work.

22.     Plaintiff undertook his new assignment with dedication and meticulous attention to detail.  Soon after assuming these new responsibilities, the plaintiff became concerned about the quality of certain aspects of MorningStar's work.  He raised numerous issues with upper management related to the accuracy of MorningStar's work.  Among his more serious observations against MorningStar were its quality control procedures and its delays in deliverables, defects that would almost inevitably harm T.D. Ameritrade and its core retail business.

23.     As part of his new responsibilities, plaintiff was required to grade MorningStar's performance in certain key areas.  Working methodically, the plaintiff, together with several other members of his department, gave MorningStar low scores for its work  and presented these findings to Ms. Demmissie, his direct supervisor, in an honest and forthright manner.

24.     Ms. Demmissie's response to the low scores was surprising to plaintiff.  She instructed him and others to upgrade MorningStar's scores.  She did not authorize any remedial measures.

25. Unfortunately, this same pattern would repeat itself on several subsequent occasions, as MorningStar's performance did not improve noticeably. That is, in response to his continued, analytical critique of MorningStar's work, Demmissie would simply instruct the plaintiff, and some of his co-department workers, to raise MorningStar's scores.

26. In late 2010, plaintiff presented a PowerPoint presentation on MorningStar to a T.D. Ameritrade Investment Board that included Ms. Demmissie, Jerry Krager, the Chief Compliance Officer, John Bell, the President of AmeriVest and Gil Ott, a Corporate Secretary and Legal Advisor. Plaintiff's presentation criticized MorningStar's poor product proposals for retirement-level clients and offered certain recommendations. Whereas his previous presentations had been rejected by defendant Demmissie, the expanded Board reacted differently and embraced his recommendations. The plaintiff was instructed to work with MorningStar and help it create an income model with lower risk. The outcome of the presentation was disappointing to defendant Demmissie, in light of her well-known advocacy of MorningStar.

27. In late 2011, T.D. Ameritrade invited *iShares* to propose a product for the technical allocation of equities for an International ETF (exchange traded fund) product. The plaintiff was instructed to evaluate the product, and found it to be quite impressive. Despite the good quality of *iShares*' product, Ms. Demmissie

ordered the plaintiff to solicit, and evaluate, a competing proposal from MorningStar.  Plaintiff's due diligence of the MorningStar proposed product confirmed that it was inappropriate and inferior to the *iShares* product.  When he reported this fact to defendant Demmissie, she instructed him to advise MorningStar as to how it might improve its product.  She made it clear that she wanted MorningStar to provide the product.

**PIMCO AND AMERIVEST**

28.   In April, 2012, plaintiff, working at the AmeriVest subsidiary, received a telephone call from a  representative of PIMCO, one of the leading companies in the mutual fund industry.  This representative informed him that the PIMCO funds located within a group of mutual funds in a particular AmeriVest product, had been improperly over-priced because it was at the retail class level, instead of at the institutional class level.  There was significance to this revelation.  AmeriVest, as a fiduciary, had an ethical and legal obligation to assure its customers that they were receiving the more cost-effective product, of two nearly identical products.  If the product were left unchanged, defendants would be selling their clients a product which would impermissibly increase the pass-through 12(b)(1) costs to their clients.  As a result thereof, their customers would be forced to pay for the additional overhead on the product.  Defendants would be in violation of well-established securities law.

29. Immediately recognizing the significance of this revelation, the plaintiff responded promptly to PIMCO's observation.  He undertook a review of the mutual funds in the subject program and found that several funds, including the PIMCO funds, were indeed of the wrong class.  That is, they were of retail class, rather than of institutional class.

30. The plaintiff promptly reported this finding to his superior, defendant Demmissie, and informed her of the corrective change that needed to be made so that AmeriVest and its affiliated defendants would be in compliance with their legal and ethical obligations.

31. Unfortunately, defendant Demmissie appeared to be uninterested in the ethical requirements that the plaintiff brought to her attention, and the need to address and correct the product.  Ms. Demmissie did not allow plaintiff to make the necessary revisions.  Instead, she instructed him to undertake a "revenue impact" analysis.

32. Plaintiff did as instructed.  His analysis revealed that the corrective change would save AmeriVest's clients approximately $2,000,000, but would cause the defendant companies to "lose" $1,150,000 in revenues that they were never, in fact, entitled to.  The plaintiff's analysis showed that while it might by costly for the defendant to disgorge and forego certain revenues, the defendant was never entitled to such revenues to begin with.  More specifically, his analysis showed

10

that one of defendant Demmissie's three divisions would suffer an adverse impact to its Profit & Loss balance sheet if the required corrective changes were implemented.

33.   Defendant Demmissie's response to the analysis prepared by the plaintiff was unequivocal.  She sent him an e-mail stating that no corrective changes were to be undertaken at this time.  Additionally, she verbally told the plaintiff to cease sending her any e-mails on this subject matter.  Her not-so-subtle message to him was to drop all talk about costly remedial measures.

34.   Nonetheless, plaintiff believed that, if AmeriVest and its affiliated defendants were to be compliant with securities regulations, corrective measures on the product had to be undertaken.  He decided to raise this issue again with defendant Demmissie at the earliest appropriate time.

35.   That time arrived in June, 2012 when the AmeriVest management team decided that, as a result of changing market conditions, an early re-balance of allocation within the subject investment program was necessary.  The plaintiff approached Defendant Demmissie once again and reiterated his recommendation to make the corrective changes that he had outlined, so that AmeriVest and its affiliated defendants would be in compliance, and the clients would not be overcharged. Defendant Demmissie rebuffed him and stated that the changes could not be undertaken in the current revenue environment.

11

**Invoices from Third-Party Providers**

36.   From this point, the plaintiff's relationship with his superior, defendant Demmissie,

declined.  The situation grew more strained in mid-July, 2012, when defendant

Demmissie summoned the plaintiff to discuss an old quarterly invoice from

December, 2011 or January, 2012 that had been paid months earlier.  This

invoice had been sent by a new third-party provider, a company that had replaced

the previous third-party provider, Geowealth.  (Geowealth was a third-party

provider for the defendants that had been tasked with calculating the performance

of T.D. Ameritrade's AmeriVest products.  Its managing director was Ivo Ivanov,

who had previously worked for T.D. Ameritrade and who had been plaintiff's

supervisor, prior to Demmissie.)

37.   Defendant Demmissie's summons was confusing, as plaintiff had always played a

clearly limited role with regard to Geowealth's invoices, the extent of his

involvement being to confirm whether services that had been billed, had in fact

been rendered.  It was never his responsibility to determine whether an invoice for

$14,000 to $15,000 should be paid, a task which was undertaken at the managing

director's level, i.e., Demmissie's level.  Accordingly, the plaintiff had very limited

specific involvement with the approval of invoices, a fact which Demmissie was

quite aware of.

38.   Defendant Demmissie demanded to know from him why the old quarterly invoice

had been sent under the auspices of the new third-party provider. Plaintiff answered her question and told her that he thought that Geowealth had outsourced to the new provider the task that it had previously provided to AmeriVest, and that the invoice in question had been paid a long time earlier.

39. Demmissie's response to the plaintiff was confrontational and accusatory.  She could have simply called  Geowealth's managing director, Mr. Ivanov, to receive the answer to her question.  Instead, without any evidence, she accused the plaintiff  of being untruthful and evasive with her.  Plaintiff was distressed by her reply to him.  There was no truth to defendant Demmissie's accusations.

40. However, this was not the end of defendant Demmissie's confrontational behavior to Mr. Khazin.  She again raised that she suspected Geowealth might have improperly invoiced AmeriVest for services that had been performed and invoiced by the new third-party provider or vice-versa.  Once again, this comment was directed accusatorily to the plaintiff, who was being grilled on matters that were not significant to his responsibilities, and were insignificant, and seemingly contrived, in general.  In fact, Demmissie's baseless accusation was later put to rest by Mr. Ivanov, who wrote  Demmissie, informing her that AmeriVest was up-to-date in its payments to Geowealth, and had paid fully for all services rendered by his company, thus discrediting  Demmissie's allegations.

41. Once the plaintiff learned that Demmissie's asserted suspicions against

13

Geowealth had been thoroughly dispelled, he hoped that his strained relationship with her might improve.  He considered the matter to be resolved.  Unfortunately, he was incorrect.

42.    Shortly thereafter, on or about August 10, 2012, plaintiff was summoned to the Human Resources Department, where he met with a "Relationship Manager" who, upon information and belief, may have been Lauren Kaczka.  Demmissie was also present at the meeting.  During the course of the meeting Kaczka raised anew the seemingly resolved issue of the third-party provider's invoice.  Plaintiff responded to her as he had previously replied to Demmissie, and emphasized his very limited role with regard to the particular invoice.  By her demeanor, defendant Demmissie made it clear that she still did not believe the plaintiff.  However, having failed to find any proof to confirm her accusation, defendant Demmissie told the plaintiff that she believed that he was not being open with upper management.

43.    At the conclusion of the meeting, plaintiff was told that he was being placed on administrative leave, pending further investigation.

44.    Four days later, on or about August 14, 2012, the Human Resources Department representative telephoned the plaintiff and informed him that an "investigation" had shown that he was not "transparent" and that he could no longer be trusted by upper management.  The plaintiff was told that his employment was being

terminated at once.

45.    On September 17, 2012, defendants filed Form U5 with FINRA, effectively

terminating plaintiff's registration with a false "Termination Explanation".

## COUNT ONE

### Violation of Dodd Frank Wall Street Reform and Consumer Protection Act

46.    Plaintiff repeats and reiterates the allegations set forth above, and  in the Facts

Common to All Counts, as if fully set forth herein at length.

47.    Plaintiff was an experienced professional in the financial services industry.

48.    A primary responsibility of the plaintiff was to perform due diligence on various

financial products that were to be offered by the defendants to institutional and/or

retail investors.

49.    Specifically, it was part of plaintiff's responsibilities to determine if the financial

products that he analyzed and was responsible for, were appropriate for asset

allocation and client risk tolerance, and were suitable to their intended purchasers.

Moreover, plaintiff's previous responsibilities had involved compliance issues.

50.    If a financial product that was offered by the defendants for sale to institutional

and/or retail investors did not meet proper criteria, it could potentially subject the

defendants to financial penalties.

51.    As a matter of course, once it was discovered that a particular financial product

was not appropriate or suitable, such financial product would have to be

15

corrected, before it could be offered by the defendants for sale to investors.

52.     During the course of his employment, the plaintiff became aware that a particular AmeriVest financial product, a component of which included PIMCO funds, was not in compliance with relevant securities regulations.

53.     Specifically, the financial product in question was non-compliant because it contained funds that were improperly priced at the retail class level, instead of at the institutional class level.

54.     The plaintiff brought this fact to the attention of his supervisor, a Managing Director of the defendant corporations.

55.     Despite her knowledge that the financial product at issue was out-of-compliance, and would have to be corrected, defendants' supervisor did not allow the plaintiff to take, or cause to be taken, corrective measures to the AmeriVest product, thus leaving it out-of-compliance and subjecting the defendant corporations to certain regulatory penalties.

56.     Thereafter, defendants' supervisor ordered him to drop all mention of corrective measures for this AmeriVest product.  She even told him not to raise this subject with her again.

57.      Defendants' supervisor, a Managing Director of the defendant corporations, then devised a course of action that would present him in a negative light and cause his termination.

16

58.     Upon information and belief, defendants' supervisor retaliated against the plaintiff
        because of her unwillingness to take proper remedial action, despite being shown
        by the plaintiff that an AmeriVest product contained funds that were improperly
        priced at the retail class level, instead of at the institutional class level, a violation
        of securities law.

59.     The course of action initiated by defendants' Managing Director was wrongful and
        was clearly retaliatory against the plaintiff.

60.     The course of action initiated by defendants' Managing Director was a pretext,
        intended to result in plaintiff's termination by the defendants as a retaliatory
        measure.

61.     At a meeting that was held at defendant T.D. Ameritrade's Human Relations
        Department on August 10, 2012, defendants' Managing Director made comments
        against the plaintiff in which she expressed, without justification, her doubt as to
        his honesty.

62.     The comments of defendants' Managing Director at this meeting was a
        contributing factor that led to the termination of plaintiff by the defendant
        corporations on August 14, 2012, a mere four days later.

63.     Thereafter, on September 17, 2012, defendants filed a Form U5 with FINRA,
        effectively terminating the plaintiff's registration based on a false "Termination
        Explanation."  This was a further retaliatory step taken by the defendants.

64      The Dodd Frank Wall Street Reform and Consumer Protection Act is a wide-
ranging statutory scheme designed to regulate more effectively the entire financial
services industry, and to protect both the general public, and industry
professionals, from injury or harm.

65.     Among the protections that this legislation offers is protection to industry
whistleblowers against whom retaliatory measures have been taken.

66.     Having brought to the defendants' attention on more than one occasion an
incident of non-compliance that was virtually tantamount to defendants'
misappropriation of clients' assets, and having been told by his supervisor, a
Managing Director of the defendant corporations not to raise this issue again, and
shortly thereafter, being terminated from his employment with the defendants as
retaliation, the plaintiff herein falls within Dodd-Frank's protection to
whistleblowers, in particular, 15 U.S.C. §78u-6.

67.     The SEC's final rule on whistleblowers, SEC Rule 21F, confirms that the plaintiff
falls within the protection of Dodd-Frank.

68.     Moreover, plaintiff reported defendants' violations of the law to the Securities and
Exchange Commission.  As defendants are aware, there is an ongoing
investigation by the SEC for such violations.

69.     Stated another way, the plaintiff herein is a member of the class of employees to
be protected by Dodd-Frank, and was at all relevant times, protected by this

statute.

70.  The retaliatory actions of the defendant corporations and the individual defendant were in violation of the Dodd-Frank Act.

71.  As a result of defendants' said violation of the Dodd-Frank Act, the plaintiff has been personally injured and has suffered monetary damages, including, but not limited to, loss of retroactive and prospective pay.

72.  Although the defendant signed an employment agreement in 2006 that contains an arbitration clause, under the circumstances extant, pursuant to the Dodd-Frank Act, such clause is unenforceable.

73.  Not only does Dodd-Frank make unenforceable such pre-dispute arbitration clauses, but recent rules and regulations promulgated by the two leading regulatory bodies in the financial services industry further underscore the non-enforceability of such arbitration agreements.

74.  A May, 2012 amendment to FINRA Rule 13201 states that "a dispute arising under a whistleblower statute that prohibits the use of pre-dispute arbitration agreements is not required to be arbitrated under the Code."

75.  Regulatory Notice 12-21, issued by the Securities and Exchange Commission in May, 2012 explicitly approves the aforementioned amendment to FINRA Rule 13201.

WHEREFORE, plaintiff demands judgment on the theories and causes of action set forth above, for:

A.    Compensatory damages;

B.    Punitive damages;

C.    Statutory damages, including but not limited to, double the amount awarded by a jury;

D.    Consequential damages;

E.    Staying the arbitration of the state law claims until the within federal action has been tried before this court and a jury;

F.    Counsel fees, interest and costs of suit; and

G.    Such other relief as this Court may deem fair and just.

BIEBELBERG & MARTIN
*Attorneys for Plaintiff*

Dated: September 25, 2013

By:/s/   *Keith N. Biebelberg*
    KEITH N. BIEBELBERG


**JURY DEMAND**

Plaintiff hereby requests a trial by jury on all issues so triable.

BIEBELBERG & MARTIN

20

*Attorneys for Plaintiff*

Dated:        September 25, 2013

By:/s/ *Keith N. Biebelberg*
      KEITH N. BIEBELBERG